IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARK A. BALATA,

       Plaintiff,

       vs.                           Civ. No. 19-0070 SCY

ANDREW SAUL,[1]

       Defendant.

**MEMORANDUM OPINION AND ORDER**[2]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed June 6, 2019, in support of Plaintiff Mark A. Balata's Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration, denying Mr. Balata's claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. On August 5, 2019, Mr. Balata filed his Motion to Reverse and Remand Administrative Agency Decision (Doc. 18) ("Motion"), and his Motion and Memorandum in Support of Reversing and Remanding Administrative Agency Decision (Doc. 19). The Commissioner filed a Brief in Response on October 31, 2019 (Doc. 22), and Mr. Balata filed a Reply on November 19, 2019 (Doc. 23). The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken in part and is **GRANTED.**

---

[1] Andrew Saul was sworn in as Commissioner of the Social Security Administration on June 17, 2019, and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 5, 11, 12.

## I.     Background and Procedural Record

Claimant Mark A. Balata suffers from the following severe impairment: myocardial infarction. Administrative Record ("AR") at 15. He alleges that he became disabled as of October 31, 2006. *Id.* He graduated from high school and has had some vocational training and community college classes, and he has past work experience as an auto body repair person and a small business owner. AR 19-20, 35-36, 207-08.

On April 13, 2016, Mr. Balata filed an application for Social Security Disability Insurance Benefits under Title II of the Act. AR 186-87. His application was denied on April 25, 2016 (AR 83), and upon reconsideration on August 15, 2016 (AR 90). Administrative Law Judge ("ALJ") Lillian Richter conducted a hearing on September 26, 2017. AR 27-82. Mr. Balata appeared in person at the hearing with attorney representative Victor Roybal. *Id.* The ALJ took testimony from Mr. Balata and an impartial vocational expert ("VE"), Sandra Trost. *Id.*

On April 3, 2018, ALJ Richter issued an unfavorable decision. AR 10-26. On November 27, 2018, the Appeals Council issued its decision denying Mr. Balata's request for review and upholding the ALJ's final decision. AR 1-6. On January 24, 2019, Mr. Balata timely filed a Complaint seeking judicial review of the Commissioner's final decision. Doc. 1. Because the parties are familiar with Mr. Balata's medical history, the Court reserves discussion of the medical records relevant to this appeal for its analysis.

## II.    Applicable Law

### A.     Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

2

benefits); *see also id.* § 1382c(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)     At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)     At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)     At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of the claimant's past work. Third, the ALJ determines whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's

---

[3] "Substantial work activity is work activity that involves doing significant physical or mental activities. . . . [W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(b), 416.972(b).

RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

B. Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotation omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). "Substantial evidence . . . is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (subsequent citation omitted). "It means—and means only—such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted), or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed . . . ." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation omitted). Therefore, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citation omitted), and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position[,]" *id.* at 1110 (quotation omitted). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense. The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

## III.   Analysis

In support of his Motion to Remand, Mr. Balata argues that the ALJ erred: in failing to find that he had a severe mental impairment at step two; in failing to comply with SSR 83-20 regarding the onset date of his impairments; in evaluating the opinions of various providers; in establishing that there is work in the national economy that Mr. Balata can perform; and in concluding that he could perform light work.

A.      The ALJ Did Not Err at Step Two.

Mr. Balata challenges ALJ Richter's step-two finding that he did not suffer from any severe mental impairments during the relevant time period. Doc. 19 at 15-17. At step two, an ALJ must consider whether a claimant's impairments are severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii); *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016). To be "severe," an impairment or combination of impairments must "significantly limit[ a claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). Mr. Balata has the burden of proof at step two to establish that he has an impairment severe enough to interfere with his ability to work. *Bowen*, 482 U.S. at 146 n.5. While step two requires only "a 'de minimis' showing of impairment," *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997), "the claimant must show more than the mere presence of a condition or ailment[,]" *id.* (citing *Bowen*, 482 U.S. at 153).

At step two, the ALJ found that "There is no indication of treatment for any psychological impairment prior to the date last insured. I cannot find a psychiatric medically determinable impairment." AR 16. Mr. Balata argues that, contrary to this finding, the record evidence demonstrates that his depression is a severe mental impairment. Doc. 19 at 16-17. He cites four medical records in support: (1) a May 2017 clinical interview note from John King, Ph.D., who noted that Mr. Balata "was diagnosed with panic/anxiety episodes and depression in January 2006" (*id.* at 16 (citing AR 354-56)); (2) a May 2016 treatment note from Guilherme Marin, M.D., who stated that Mr. Balata "has an extensive psychiatric history" (*id.* (citing AR 432)); (3) a November 2016 treatment note from Physician Assistant Savannah Tanner, who parroted Dr. Marin's observation about Mr. Balata's "extensive psychiatric history" (*id.* (citing AR 438)); and (4) a May 2017 Adult Comprehensive Assessment by David Alexander, Licensed Mental Health Counselor (LMHC), that details Mr. Balata's mental health history and concerns

(*id.* (citing AR 420)). Yet these records are all from a time period *after* Mr. Balata's date last insured. He fails to point the Court to any medical record from the relevant time period to demonstrate that he had concerns about his mental health, sought treatment for mental conditions, or obtained medications or other treatment for mental limitations. *See id.* The Court agrees with the ALJ that the lack of any mention, treatment, or medication for depression in the medical record during the relevant time period "tends to undermine a conclusion that this condition was severe." *Lopez v. Berryhill*, No. CV 16-552 SCY, 2017 WL 4356384, at *4 (D.N.M. Sept. 30, 2017).

Even if Mr. Balata could establish that the ALJ erred at step two in determining that his depression was not severe, the error is harmless. At this step "a claimant need only establish, and an ALJ need only find, one severe impairment." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007)). The ALJ found that Mr. Balata's myocardial infarction was severe at step two. AR 15. Moreover, despite her finding that Mr. Balata's mental impairments were non-severe, ALJ Richter incorporated several limitations into the RFC related to his mental impairments. AR 16. Specifically, ALJ Richter limited Mr. Balata to simple routine work, to occasional interaction with supervisors and coworkers, to incidental interaction with the public, and to communicating simple information. AR 16. Mr. Balata does not argue that these limitations are unsupported by substantial evidence. Accordingly, the Court will not remand on this issue.

B.    SSR 83-20 is inapplicable in this case.

Mr. Balata next argues that ALJ Richter erred by failing to call a medical advisor to establish the onset date of his cardiac impairment. Doc. 19 at 17-20. The regulation relevant to determining an onset date of disability, SSR 83-20, provides that "[i]n addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability."

SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). "When the onset date of disability must be

inferred, the ruling clarifies that the ALJ 'should call on the services of a medical advisor.'"

*Gonzales v. Berryhill*, No. CV 17-0601 KBM, 2018 WL 4688312, at *7 (D.N.M. Sept. 28, 2018)

(quoting SSR 83-20, 1983 WL 31249, at *3). "It becomes necessary to infer the onset date when,

for instance, 'the alleged onset and the date last worked are far in the past and adequate medical

records are not available.'" *Id.* (quoting SSR 83-20, 1983 WL 31249, at *2). Mr. Balata asserts

that because the ALJ referenced a lack of record evidence regarding medical treatment between

2005 and 2014 (AR 17), she should have called a medical advisor to determine the onset date of

his cardiac impairment pursuant to SSR 83-20. Doc. 19 at 17-18.

   The Commissioner argues that Mr. Balata's "reliance on SSR 83-20 is misplaced[,]"

because "a finding of disability is a prerequisite to determining the onset date." Doc. 22 at 8

(citing SSR 83-20, 1983 WL 31249, at *1 ("The onset date of disability is *the first day an*

*individual is disabled* as defined in the Act and the regulations.")). The Tenth Circuit has

interpreted SSR 83-20 similarly. In *Hill v. Astrue*, the Tenth Circuit noted that medical advisor

testimony "is helpful where the ALJ has determined that the claimant eventually became

disabled but there is some ambiguity about whether the onset of this disability occurred prior to

the expiration of the claimant's insured status." 289 F. App'x 289, 294 (10th Cir. 2008) (citing

*Blea v. Barnhart*, 466 F.3d 903, 913 (10th Cir. 2006)); *See also Garcia v. Comm'r, SSA*, No. 19-

6107, 2020 WL 3443455, at *4 (10th Cir. June 24, 2020) ("the need to determine an onset date is

relevant only when a claimant has been found disabled"). Here, as in *Hill*, "the ALJ never made

a finding that [Mr. Balata] eventually became disabled," so there is no "ambiguous 'onset date'

which required clarification." *See id.*

8

Mr. Balata summarily states in his reply brief that ALJ Richter "found [him] disabled from returning to his past work." Doc. 23 at 5. This is inaccurate. The ALJ found that Mr. Balata was "unable to perform any past relevant work" (AR 19), but that statement does not equate to a finding of disability. Instead, as the ALJ explained in the decision, it means that due to his RFC, Mr. Balata was unable to perform his past relevant work as an auto body repair person or a small business owner prior to his date last insured. AR 19; *see also* 20 C.F.R. § 404.1565. The Court denies Mr. Balata's motion on this issue.[4]

C.    ALJ Richter adequately evaluated the record opinions.

Mr. Balata argues that the ALJ inadequately analyzed the opinions of John King, Ph.D., Neal Shadoff, M.D., David Alexander, LMHC, and Guilherme Marin, M.D. Doc. 19 at 20-24. The Court will examine the ALJ's treatment of each provider below.

An ALJ must evaluate and weigh every medical opinion in the record, regardless of its source. *See* 20 C.F.R. § 404.1527(c). Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." *Id.* § 404.1527(a)(1). In

---

[4] On October 2, 2018, the Commissioner rescinded SSR 83-20 and replaced it with SSR 18-01p. *See* "Titles II and XVI: Determining the Established Onset Date (EOD) in Disability Claims," 83 Fed. Reg. 49,613, 2018 WL 4694326. SSR 18-01p applies "to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date" of October 2, 2018. *Id.* at 49,616. "This means that we will use this SSR on and after its applicable date, in any case in which we make a determination or decision." *Id.*

Unlike SSR 83-20, SSR 18-01p expressly permits the ALJ to "infer" an onset date and emphasizes that the decision to call on a medical advisor "is always at the ALJ's discretion." *Id.* at 49,615-16. Thus, even if Mr. Balata were to prevail on his argument that the case must be remanded for failure to call a medical advisor, on remand SSR 18-01p would apply and the ALJ would not be required to call a medical advisor.

weighing a medical opinion, the ALJ considers several factors: the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. *Id.* § 404.1527(c).  "The record must demonstrate that the ALJ considered all of the evidence," but there is no requirement that the ALJ "discuss every piece of evidence." *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014) (quoting *Clifton*, 79 F.3d at 1009-10). Although the ALJ is not required to discuss every piece of evidence, "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Clifton*, 79 F.3d at 1010. The ALJ must provide "'specific, legitimate reasons' for rejecting" an opinion. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).  Ultimately, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

       1.    <u>Dr. King</u>

On May 24, 2017, Dr. King conducted a one-time neuropsychological evaluation of Mr. Balata. AR 354-63. The evaluation consisted of a review of Mr. Balata's "minimal" medical records, a clinical interview, and a variety of tests. *See id.* The ALJ adequately summarized Dr. King's notes from the clinical interview and noted that the "[o]verall results showed that premorbid intellectual ability was in the average range. Testing did not show a significant decline from previous functioning. He was diagnosed with mild neurocognitive disorder due to multiple etiologies. Review of records indicated depressive symptomology since 2006." AR 18

(citing AR 361). The ALJ gave Dr. King's opinion little weight because it was "rendered five years after the date last insured and nothing in [the] opinion suggests any assessment of the claimant's ability to perform work-related functions prior to the date last insured." AR 18.

Mr. Balata argues that the ALJ failed to consider the § 404.1527(c) factors in evaluating Dr. King's opinion. Doc. 19 at 22. The Court disagrees. The ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, the decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quotation omitted). With respect to the first, second, and fifth factors, ALJ Richter noted that Dr. King performed a single neuropsychological evaluation at the request of Mr. Balata's primary care provider. AR 18. With respect to the third factor, the ALJ discussed the various tests performed and Dr. King's review of the medical records. AR 18. And importantly, regarding the sixth factor, the ALJ noted that Dr. King's opinion did not relate back to the relevant time period. AR 18. The Court finds support for this conclusion in Dr. King's opinion, which states that he "assess[ed Mr. Balata's] *current* level of neurocognitive functioning . . . ." AR 354, 361 (emphasis added). Thus, even if the opinion is "entitled to complete deference" as Mr. Balata maintains (Doc. 19 at 23), he has not shown that it is relevant to the time period under consideration. The Court finds no error in the ALJ's evaluation of Dr. King's opinion.

        2.   <u>Dr. Shadoff</u>

Mr. Balata references "evidence" in the record from Dr. Shadoff, who treated him two times in 2004: once in July to perform a stent placement and heart catheterization, and the second in August 2004 for a follow-up visit. AR 371-89 (notes from July 4, 2004 procedure),

365-67 (Aug. 30, 2004 follow-up visit notes). The ALJ summarized these notes in her decision.
AR 17. Mr. Balata asserts that Dr. Shadoff's "opinion" is "not controverted [and thus] entitled to
complete deference." Doc. 19 at 23. Mr. Balata misunderstands the meaning of a "medical
opinion." "Medical opinions are statements from acceptable medical sources that reflect
judgments about the nature and severity of your impairment(s), including your symptoms,
diagnosis and prognosis, what you can still do despite impairment(s), and your physical or
mental restrictions." 20 C.F.R. § 404.1527(a)(1). In deciding whether a doctor's statement is a
"true medical opinion," Tenth Circuit guidance indicates the relevant inquiry is whether the
statement contains the doctor's judgment about the "nature and severity of [the claimant's]
physical limitations, or any information about what activities [the claimant] could still perform."
*Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008) (citing 20 C.F.R. § 404.1527(a)(2)). The
July 2004 procedure record and the August 2004 treatment record are just that—medical records
by a treating provider. Neither reflects medical judgments about the nature or severity of Mr.
Balata's limitations. The ALJ therefore did not err in failing to assign them weight, much less
controlling weight.

3.   LMHC Alexander

On May 15, 2017, LMHC Alexander saw Mr. Balata for an "Adult Comprehensive
Assessment." AR 419-30. The record states that Mr. Balata was referred to LMHC Alexander by
"Presbyterian medical group for concerns of feeling down, memory difficulty, and physical
health concerns." AR 419. ALJ Richter mentioned the Assessment with LMHC Alexander, but
she did not evaluate it as an "opinion." AR 18. She noted that Mr. Balata "had an evaluation at
Open Skies Healthcare on May 15, 2017 because of reported memory difficulties. He was

diagnosed with depression and it was recommended that he start therapy." *Id.* (citing AR 419, 429).

Mr. Balata argues that the Assessment is notable because it "relates a past history of childhood physical and sexual abuse" and expresses a "primary concern" regarding "his loss of ability related to his history of cardiovascular disease and multiple concussions." Doc. 23 at 8. He also notes that LMHC Alexander recommended a psychiatric evaluation and medication. *Id.* (citing AR 427-28). The Commissioner argues that nothing in the Assessment ties Mr. Balata's symptoms or diagnoses—particularly those he may have had prior to his date last insured—to any specific, work-related limitations. Doc. 22 at 15. Furthermore, he notes that Mr. Balata "has not demonstrated that any further evaluation of this evidence would change the outcome of his case." *Id.*

The Assessment largely consists of notes that are based on Mr. Balata's self-reporting. *See* AR 419-30. The Assessment does include a section that asks how Mr. Balata's symptoms interfere with functioning in several areas, including independent living, learning, working, socializing, recreation, safety in community, crisis management and prevention, and making independent choices. AR 428. In that section, LMHC Alexander notes that Mr. Balata lives independently but "has difficulty leaving his home at times because he becomes confused or overwhelmed"; that he ran a business before his heart attack and a traumatic brain injury due to a car accident and "stopped working after his fianc [sic] ended their engagement"; that he "has decreased interested [sic] in things he previously enjoyed due to depression and his concerns about leaving his home and his limitations in physical mobility"; and that his "decisions are impacted by his depression and hopelessness that his physical and cognitive limitations may not improve." *Id.*

None of these observations contains a judgment about the "nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan*, 552 F.3d at 1189 (citing 20 C.F.R. § 404.1527(a)(2)); *see also Keyes-Zachary*, 695 F.3d at 1164 (although some of the statements in a therapist's report "might be considered 'opinions' in the broad sense described by SSR 06-3p[,]" the ALJ's failure to analyze them was not harmful error because "[n]one of these observations . . . offers an assessment of the effect of [the claimant's] mental limitations on her ability to work"). Because LMHC Alexander failed to "offer[] an assessment of the effect of [Mr. Balata's] mental limitations on [his] ability to work[,]" *see Keyes-Zachary*, 695 F.3d at 1164, the Court must affirm the ALJ's decision on this point.

       4.   <u>Dr. Marin</u>

Dr. Marin, Mr. Balata's treating cardiologist, completed a Cardiac Residual Functional Capacity Questionnaire on August 24, 2017. AR 456-60. The ALJ thoroughly summarized Dr. Marin's opinion. AR 18. Dr. Marin stated that Mr. Balata's "prognosis was good from a cardiac standpoint." *Id.* (citing AR 456). He opined that Mr. Balata has no "marked limitations of physical activity[,]" that his "cardiac symptoms would never or seldom interfere with his attention and concentration[,]" and that "[h]e was capable of low stress jobs." AR 18-19 (citing AR 457). The ALJ recounted the specific physical limitations Dr. Marin opined, including that Mr. Balata "could lift up to 20 pounds frequently and more than 50 pounds occasionally[,]" and that "[h]e should avoid concentrated exposure to cold, heat, noise, pulmonary irritants, and hazards." AR 19 (citing AR 459). Notably, Dr. Marin opined that Mr. Balata "would have no cardiac limitations" and "that the earliest date that his opinion applied was June 26, 2017, more than four years after the date last insured." *Id.* (citing AR 460). ALJ Richter then reviewed Dr.

Marin's medical records and assigned little weight to the opinion because it was "internally inconsistent." *Id.*

The Court notes that because Dr. Marin is a treating provider, the ALJ was first required to determine whether his opinion was entitled to "controlling weight." *Watkins*, 350 F.3d at 1300. Controlling weight is required if the opinion is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." *Id.* (quoting SSR 96-2, 1996 WL 374188, at *2 (July 2, 1996)). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* (citation omitted). If it is not given controlling weight, "at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors" in 20 C.F.R. § 404.1527(c). *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (citation omitted). The ALJ's determination must be supported by substantial evidence. *Doyal*, 331 F.3d at 760.

In this case, ALJ Richter did not specify whether she was giving Dr. Marin's opinion controlling weight, but the Court infers that she did not from the fact that she gave it little weight. *See Mays*, 739 F.3d at 575 (finding remand was unnecessary where the ALJ "implicitly declined to give" a treating physician's opinion controlling weight).

Mr. Balata complains that the ALJ did not address the § 404.1527(c) factors at the second step. Doc. 19 at 22. The Court disagrees. With respect to the first, second, and fifth factors, the ALJ noted that Mr. Balata saw Dr. Marin, his "treating cardiologist," for cardiac care since May 2014. AR 19. There is some confusion regarding this date, because Dr. Marin stated that the "[n]ature, frequency and length of [his] contact" with Mr. Balata has been "since 2004." AR 456.

Mr. Balata also avers that he began seeing Dr. Marin in 2004 (Doc. 19 at 23 (citing AR 456)), but he does not point to, nor can the Court find, any treatment records signed by Dr. Marin before 2014.[5] Mr. Balata summarily asserts that because Dr. Marin's opinion is "not controverted[,]" it is therefore "entitled to complete deference." Doc. 19 at 23. But as the ALJ found, Dr. Marin specified "that the earliest date that his opinion applied was June 26, 2017, more than four years after the date last insured." AR 19, 460. Mr. Balata fails to explain why Dr. Marin's opinion should apply from October 31, 2006, through December 31, 2012.

Regarding the third factor, ALJ Richter summarized the record evidence from Dr. Marin, observing that he performed bare metal stent testing and recommended a coronary angiography, which Mr. Balata declined. AR 19 (citing, *e.g.*, AR 290, 309, 432, 437); *see also* AR 294-303. The ALJ also highlighted several of the limitations Dr. Marin opined in the June 2017 questionnaire. AR 19 (citing AR 456-60). The ALJ focused on the fourth factor, noting that while Dr. Marin "assessed the claimant with limitations that included good days and bad days[, he] also noted that the claimant had no cardiac limitations." *Id.*; *see also* AR 459-60. In short, the Court finds that the ALJ adequately evaluated Dr. Marin's opinion at the second step of the treating physician analysis.

5.      State Agency Providers

Finally, Mr. Balata contends that it was error for the ALJ to rely on the opinions of the state agency providers, who "noted that there was no medical evidence during the relevant period and opined that they could not determine mental impairment due to insufficient evidence." AR at 18 (citing AR 86-87, 95-96); Doc. 19 at 23. "The absence of evidence[,]" he argues, "is not

_____

[5] The Court notes that Mr. Balata testified at the Administrative Hearing that he "met [Dr. Marin] when [he] had a second heart attack in 2014." AR 40.

evidence." Doc. 19 at 23 (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993)).

Four state agency providers reviewed Mr. Balata's claim and recommended that it be denied for insufficient evidence. *See* AR 86-87, 95-96. The providers did not assess an RFC or discuss Mr. Balata's mental or physical limitations due to this lack of evidence. *See* AR 87, 96 ("No RFC/MRFC assessments are associated with this claim."). Yet while ALJ Richter gave "great weight" to the state agency opinions because "they are consistent with the availability of records at the time of their review[,]" AR 18, she did not exclusively rely on the opinions in determining the RFC. Instead, as the Commissioner observes, ALJ Richter went on to "assess[] a severe impairment and limitations associated with" both Mr. Balata's cardiac condition as well as his depression. *Id.*; *see also* Doc. 22 at 9 (citing AR 16-18). Thus, the ALJ did not merely rely on the state agency opinions or on an absence of evidence in making her ultimate RFC determination.

D.  The ALJ's step five finding is not supported by substantial evidence.

The Court reverses and remands at step five of the disability determination analysis. At step five, ALJ Richter relied on testimony from the VE, Ms. Trost, to find that Mr. Balata retained the RFC to perform the positions of photocopy machine operator, marker, and silver wrapper. AR 20. Mr. Balata claims this was error for three reasons. Although the Court rejects Mr. Balata's first argument that the VE was not qualified, the Court agrees with Mr. Balata's second contention that the ALJ wrongfully restricted his right to cross-examine the VE during the administrative hearing, and that this error requires remand. Finally, the Court disagrees with Mr. Balata that the ALJ was required to adopt VE testimony regarding limitations that did not appear in the RFC.

1.     The VE was qualified.

Mr. Balata first alleges that "[t]he VE was not qualified to give an opinion due to a lack of relevant expertise in rehabilitation counseling." Doc. 19 at 25. He made this same objection during the hearing. AR 70-71. The ALJ asked Ms. Trost to "articulate [her] experience in vocational rehabilitation[,]" and she responded that she has "worked as a vocational rehabilitation counselor for over 30 years." AR 71. Specifically, Ms. Trost "worked in the professional rehabilitation field in California under the workers' compensation laws." *Id.* She has a master's degree in psychology and is licensed in California as a marriage and family therapist. *Id.* She has utilized the skills gained in those areas as a vocational rehabilitation counselor. *Id.* The ALJ overruled Mr. Balata's objection to the VE's qualifications and allowed her to testify. AR 72. The Commissioner contends that Mr. Balata fails to ground his objection to Ms. Trost's qualifications in any regulation or legal authority, but instead rests only on his belief that the VE is unqualified. Doc. 22 at 16.

Mr. Balata generally argues that Ms. Trost's "credentials were insufficient to qualify her as an expert." Doc. 23 at 10. He cites to several non-binding appellate court cases on expert witnesses, none of which involve VEs in social security cases. *Id.* (citations omitted). He acknowledges that the Social Security Administration "does not provide a minimal standard to qualify as a VE." Doc. 19 at 25. Instead, it offers a Vocational Expert Handbook, which provides a set of skills that an "ideal VE" will possess.

[A]n ideal VE will have:

- Up-to-date knowledge of, and experience with, industrial and occupational trends and local labor market conditions.
- An understanding of how we determine whether a claimant is disabled, especially at steps 4 and 5 of the sequential evaluation process . . . .
- Involvement in or knowledge of vocational counseling and the job placement of adult, handicapped workers into jobs.

- Knowledge of, and experience using, vocational reference sources of which the agency has taken administrative notice under 20 [C.F.R. §§] 404.1566(d) and 416.966(d), including:
    - The Dictionary of Occupational Titles [("DOT")] and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO);
    - County Business Patterns and Census reports published by the Bureau of Census;
    - The Occupational Outlook Handbook published by the Bureau of Labor Statistics; and
    - Any Occupational analyses prepared for SSA by various state employment agencies.

Vocational Expert Handbook, at 8-9 (Aug. 2017), https://www.ssa.gov/appeals/public_experts/

Vocational_Experts_(VE)_Handbook-508.pdf (italics omitted).

Ms. Trost testified that she is a vocational rehabilitation counselor. According to the

DOT, a vocational rehabilitation counselor's job functions include:

Interviews and evaluates handicapped applicants, and confers with medical and professional personnel to determine type and degree of handicap, eligibility for service, and feasibility of vocational rehabilitation. Accepts or recommends acceptance of suitable candidates. Determines suitable job or business consistent with applicant's desires, aptitudes, and physical, mental, and emotional limitations. Plans and arranges for applicant to study or train for job. Assists applicant with personal adjustment throughout rehabilitation program. Aids applicant in obtaining medical and social services during training. Promotes and develops job openings and places qualified applicant in employment. May specialize in type of disability, such as mental illness, alcohol abuse, hearing and visual impairment, or readjustment after prison release.

DOT, Code 045.107-042, Vocational Rehabilitation Counselor, https://occupationalinfo.org/

04/045107042.html (last visited Feb. 24, 2020). These functions appear to be directly relevant to

several skills possessed by an "ideal VE," including, at a minimum, "knowledge of vocational

counseling and the job placement of adult, handicapped workers into jobs" and "understanding

of how we determine whether a claimant is disabled." *See* Vocational Expert Handbook, at 8-9;

*see also* Hearings, Appeals and Litigation Law Manual § I-2-1-31, https://www.ssa.gov/OP_

Home/hallex/I-02/I-2-1-31.html (last visited Feb. 12, 2020) (describing how the Office of Hearings Operations qualifies VEs).

Ms. Trost has 30 years of experience as a vocational rehabilitation counselor, and Mr. Balata points to no legal authority that supports a finding that Ms. Trost's relevant experience is inadequate under the circumstances.[6] Consequently, the Court finds that substantial evidence supports the ALJ's decision to overrule the objection to Ms. Trost's qualifications. It was not error for the ALJ to rely on the VE's testimony.

2.     The ALJ violated Mr. Balata's procedural due process rights.

Mr. Balata next contends that the ALJ denied him due process of law when she refused to let him question Ms. Trost about SkillTRAN, a software program Ms. Trost relied on to determine the number of jobs available in the national economy. Doc. 19 at 25-26. Disability claimants are entitled to procedural due process in the hearing setting. *Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994). And, while the Tenth Circuit has cautioned that "the role of cross-examination in disability proceedings should remain limited[,]" it has affirmatively held that due process includes the "right to cross examine vocational experts . . . ." *Haddock v. Apfel*, 196 F.3d 1084, 1090-91 (10th Cir. 1999) (citations omitted). As the Court explains below, ALJ Richter precluded Mr. Balata from meaningfully questioning the VE on how she arrived at the number of jobs available in the national economy.

At the administrative hearing, Mr. Balata's attorney, Mr. Roybal, asked the VE what she relied on to provide the job number data. AR 76. Ms. Trost replied that she used "SkillTRAN

---

[6] Mr. Balata asserts that the International Association of Rehabilitation Professionals (IARP) has its own set of professional qualifications for VEs, and that Ms. Trost does not meet the IARP standards. Doc. 19 at 25. But he fails to explain how Ms. Trost falls short of the IARP standards. *Id.* And more importantly, he fails to establish that these standards are at all relevant in this context.

numbers[,] which are updated, 2017." *Id.* Mr. Roybal then asked, "Do you know the methodology that SkillTRAN used in arriving at those numbers?" Ms. Trost began to answer, "Various methods[,]" when the ALJ interrupted and said, "I don't think that you need to answer that because SkillTRAN is a widely accepted program that Social Security utilizes. So, regardless of her knowledge of the methodology, it doesn't change the fact that it's an accepted program." AR 76-77. Mr. Roybal continued, "Do you know if SkillTRAN is accurate?" AR 77. The ALJ directed, "Don't answer that. We still – don't answer that." *Id.* Thus, the ALJ effectively precluded Mr. Roybal from asking the VE any questions beyond the name of the program she used to get the job number data.

The Commissioner contends that "it was arguably reasonable for the ALJ to end Plaintiff's questioning where she did." Doc. 22 at 16-17. He continues, "a number of courts have rejected Plaintiff's suggestion that an expert's testimony is unreliable merely because the expert does not know how [SkillTRAN] calculates job numbers." *Id.* at 17 (citations omitted). But Mr. Roybal did not just attempt to ask the VE about the methodology SkillTRAN employs. When ALJ Richter prohibited the VE from answering Mr. Roybal's question about methodology, Mr. Roybal then simply asked the VE if she knew whether SkillTRAN was accurate. Asking a VE about whether the data the VE relies on is accurate is different than asking the VE to explain the methodology SkillTRAN uses to arrive at its data. A VE who is not able to explain the methodology SkillTRAN uses could nonetheless provide an alternative basis for believing the SkillTRAN data is accurate. Thus, the Commissioner's argument does not address whether a claimant has a due process right to cross-examine an expert about the accuracy of the data on which the expert relies. AR at 76-77. Nor does the Commissioner establish that Mr. Roybal's line of questioning was somehow improper. To the contrary, guidance from both the Tenth

21

Circuit and the United States Supreme Court indicates that Mr. Roybal was entitled to ask questions about the accuracy and reliability of the VE's job number data.

In *Biestek v. Berryhill*, the Supreme Court stated that a social security "applicant may probe the strength of [a VE's] testimony by asking [the] expert about (for example) her sources and methods—where she got the information at issue and how she analyzed it and derived her conclusions." 139 S. Ct. 1148, 1156-57 (2019) (citation omitted).[7] Here, Mr. Roybal attempted to "probe the strength of" Ms. Trost's testimony by asking her about where and how she derived the job number data. *See id.*; AR at 76-77. Although Ms. Trost testified that she relied on SkillTRAN, the Administrative Record contains no testimony related to whether SkillTRAN is reliable. The Commissioner asserts that SkillTRAN "(also known as Job Browser Pro) is a software product used in a variety of settings, including rehabilitation, education, expert testimony, and career transition." Doc. 22 at 16 n.2 (citing SkillTRAN, https://skilltran.com). Plaintiff correctly observes that SkillTRAN is "published by a private entity" and "is not a government publication," nor is it among the resources that the Social Security Administration has taken administrative notice of regarding job data. *See* Doc. 23 at 11-12 (citing Vocational Expert Handbook, https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf); *see also* 20 C.F.R. § 404.1566(d) (listing administratively noticed sources of reliable job information). Other courts have held that, because the Social Security

---

[7] Mr. Balata cites to authority from the Seventh Circuit to assert that he was "entitled to challenge any statistical analysis and the source of that data" to ensure that the vocational testimony was "based upon 'reliable methods.'" Doc. 23 at 11 (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). The Seventh Circuit had, however, imposed a *Daubert*-like standard on ALJs to determine whether a VE's testimony is reliable. *See, e.g.*, *McKinnie v. Barnhart*, 368 F.3d 907, 910-11 (7th Cir. 2004), *abrogated by Biestek*, 139 S. Ct. at 1153-54. The Supreme Court explicitly disavowed such a standard, and the Court does not rely on *Donahue* in reaching its decision in this case. *Biestek*, 139 S. Ct. at 1153-54.

Administration has not taken administrative notice of SkillTRAN, it is "not necessarily presumed to be reliable." *Henderson v. Saul*, No. CV 17-2846 (CKK), 2019 WL 5549907, at *8 (D.D.C. Oct. 28, 2019) (citations omitted); *see also Anders v. Berryhill*, 688 F. App'x 514, 523 (10th Cir. 2017) (finding that "Job Browser Pro is not among the examples listed in 20 C.F.R. § 404.1566(d) of data sources considered to provide reliable job information").

Of course, a VE is not restricted to sources that are noticed in § 404.1566(d).  *See Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993). If a claimant has a question about the reliability of non-noticed sources, however, Tenth Circuit precedent emphasizes the importance of allowing the claimant to question the VE about those sources. *See id.* In *Gay*, the claimant questioned "the legitimacy of a [VE] relying on a publication not specifically listed in § 1566(d) . . . ." *Haddock*, 196 F.3d at 1090 n.2 (discussing *Gay*, 986 F.2d at 1340). But because the claimant had "fail[ed] . . . to cross-examine the [VE] about her non-listed source publication[,]" it was "impossible for [the Tenth Circuit] to assess on appeal whether the VE's testimony was unreliable." *Id.* (citing *Gay*, 986 F.3d at 1340 & n.2). Here, by preventing Mr. Roybal from questioning the VE about her non-listed source publication, ALJ Richter made it impossible for this Court to assess whether Ms. Trost's testimony was reliable.

The Court further recognizes that "the conduct of the hearing rests generally in the [ALJ's] discretion.'" *Galdean v. Barnhart*, 46 F. App'x 920, 923 (10th Cir. 2002) (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)). Thus, the ALJ may limit a claimant's inquiry into a matter that is outside the scope of the hearing. In *Galdean*, the Tenth Circuit found no error where the ALJ "refus[ed] to allow an inquiry into [the claimant's] hand injury by stressing that the scope of the remand hearing was limited to matters involving [his] mental status and language difficulties." *Id.* Yet, the issue of whether Ms. Trost's testimony was reliable was

properly within the scope of Mr. Balata's administrative hearing. Moreover, ALJ Richter did not merely limit the scope of Mr. Balata's cross-examination regarding SkillTRAN; instead, she completely barred it. Because the Commissioner "has the burden at step five, [the ALJ] must correlate a VE's testimony in an individual case with vocational information provided in the [DOT] or other reliable publications." *Haddock*, 196 F.3d at 1089. By precluding Ms. Trost from testifying about the reliability of a non-noticed source publication, the Commissioner cannot sustain his burden in this case. *See id.*

      The Court does not find today that Ms. Trost should have been required to describe in detail the methodology underlying SkillTRAN. Instead, the Court finds, at a minimum, Mr. Balata was entitled to receive an answer to the question he asked: "Do you know if SkillTRAN is accurate." *See, e.g.*, *Purdy v. Berryhill*, 887 F.3d 7, 16-17 (1st Cir. 2018). In *Purdy*, for example, the claimant asserted that the ALJ erred in relying on a VE's testimony, where the VE used SkillTRAN to calculate the job number data. *Id.* at 14. The claimant cross-examined the VE, who testified "that she did not know what precise analysis SkillTRAN followed" but was able to generally describe the "reliable and practical basis of fact on which [her] analysis was performed, and to a wide reputation for reliability." *Id.* at 15, 16; *see also Pedone v. Berryhill*, No. 16-CV-02767- STV, 2018 WL 460063, at *7 (D. Colo. Jan. 18, 2018) (gathering cases that have found that a "VE's reliance on SkillTRAN without any testimony or evidence that she could endorse those numbers based on her knowledge and expertise render[s] her testimony unreliable" and thus required remand "for the ALJ to properly consider evidence regarding" the job number data) (quotation omitted). The First Circuit found no reversible error but noted, "[t]his is not to say that we could go to the extreme of approving reliance on evidence of the software numbers offered by a witness who could say nothing more about them than the name of

the software that produced them." *Purdy*, 887 F.3d at 16. The ALJ's decision to cut off Mr. Roybal's questioning leaves the record in this case looking like the extreme hypothetical of which the First Circuit indicated disapproval in *Purdy*.

For these reasons, the Court finds that Mr. Balata has successfully shown that he was denied due process at the administrative hearing. "A due process claim will not succeed, however, if the claimant fails to show prejudice." *Mays v. Colvin*, 739 F.3d 569, 573 (10th Cir. 2014) (citing *Energy W. Mining Co. v. Oliver*, 555 F.3d 1211, 1219 (10th Cir. 2009)). "Thus, when a party complains about the course of administrative proceedings, that party must demonstrate that the adjudication was infected by some prejudicial, fundamentally unfair element." *Id.* (quotation marks, emphasis, and citations omitted). Had the ALJ's decision outlined some other valid basis to find the VE's testimony reliable, the Court may have been able to find harmless error. However, the Court notes with concern the ALJ's comments on this issue in her written decision, which actually underscore why the error here is prejudicial. ALJ Richter stated: "Sufficient basis for [VE] testimony can be the expert's professional knowledge and experiences as well as reliance on job information available from various governmental and other publications, of which the Agency takes administrative notice." AR 21 (citing 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d)). The ALJ described Ms. Trost's experience and concluded that "[o]ne need not be a trained statistician to provide a reliable expert opinion as to the extent to which non-exertional limitations might (if at all) affect the numbers of jobs cited by governmental and other publications **of which the Agency takes administrative notice.** Accordingly, the vocational expert's testimony is found to be reliable." AR 21 (emphasis added).

Thus, it appears that the ALJ believed that SkillTRAN is administratively noticed and based her finding of reliability on that erroneous belief. [8]

Although unpublished, the Court finds an Eleventh Circuit case on this topic persuasive. In *Lynch v. Astrue*, "the ALJ blocked the VE from developing and explaining to the claimant's attorney a basis for her interpretation of the sources upon which she relied." 358 F. App'x 83, 88 (11th Cir. 2009). The Eleventh Circuit found that, in the absence of such testimony, the court was "without 'relevant evidence that a reasonable mind might accept as adequate to support' the conclusion that there are other jobs that [the claimant] is able to perform." *Id.* (quoting *Perales*, 402 U.S. at 401). The same is true here: Mr. Balata has shown prejudice because the ALJ completely precluded him from questioning the VE about her job number calculations. Thus, Mr. Balata has shown that the step five finding is not supported by substantial evidence, and this matter must be remanded for further proceedings. *See Martin v. Comm'r of Soc. Sec.*, No. 2:17-CV-496-FTM-99CM, 2018 WL 3468712, at *9 (M.D. Fla. June 29, 2018), *R&R adopted*, No. 2:17-CV-496-FTM-38CM, 2018 3458299 (M.D. Fla. July 18, 2018). The Court will grant Mr. Balata's motion on this issue.

    E.    <u>The ALJ was not obligated to consider limitations that were not included in the RFC.</u>

Finally, Mr. Balata argues that the ALJ erred in finding that he was not under a disability, because Ms. Trost testified that "an individual would be unemployable . . . if they were unable to complete a shift as scheduled . . . , or . . . absent from work two times a month, or unable to

---

[8] At the hearing, the ALJ justified her decision to bar cross-examination on SkillTRAN by stating, "SkillTRAN is a widely accepted program that Social Security utilizes . . . it's an accepted program." AR 76-77. The ALJ's decision indicates that this statement was also based on the ALJ's misapprehension about whether the Social Security Administration had taken administrative notice of SkillTRAN. Regardless of this statement, however, the ALJ committed error in not allowing Mr. Balata to question the accuracy of SkillTRAN data.

respond appropriately to supervision." Doc. 19 at 26-27 (citing AR 74-75). The Commissioner responds that these limitations are not included in Mr. Balata's RFC, "as they were not supported by the overall record during the relevant time period." Doc. 22 at 18. The Court agrees. The VE identified three jobs that an individual with the limitations assessed in Mr. Balata's RFC could perform. AR 20, 73. The Court finds that the ALJ did not err in failing to consider these limitations, as they were not included in the RFC. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (holding that because the ALJ's findings regarding the claimant's conditions were "accurately reflected in the ALJ's hypothetical inquiries, the [VE's] testimony provided substantial evidence" to support the decision).

**IV.    Conclusion**

        For the reasons stated above, Mr. Balata's Motion to Reverse and Remand Administrative Agency Decision (Doc. 18) is **GRANTED.**


**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by Consent**